Good morning, Dean. Welcome. Good morning. May it please the Court, my name is Erwin Shimransky and I represent the Plaintiff's Appellants. I'm going to try to save five minutes for rebuttal. Keep your eye on the clock. We'll try to help you. Thank you. The primary issue in this case is in a race discrimination claim under Section 19A1. What must be alleged in order for it to be plausible? Plaintiff's complaint details many facts that support a claim of race discrimination. Defendants offer an alternative explanation. This Court in Starr v. Baca instructed how such a situation should be handled. The words of this Court are so instructive, I'd ask to read them right at the outset to you. For 652F3 at 1216, this Court said, If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12b-6. Plaintiff's complaint may be dismissed only if defendant's plausible alternative explanation is so convincing that plaintiff's explanation is implausible. Many facts in the complaint support a plausible claim of race discrimination. Counsel, let me just get to the heart of my concern. Some were concerned about whether Mottoyer was still valid under Miller v. Gammy, Lydic Gross, and Nassar. But from my part, I read this statute as having a rather peculiar requirement that sounds in the way people talked in 1866 when this statute was enacted. And specifically, it indicates whether, in this case, whether the plaintiff has been given the same right to contract as are enjoyed by white citizens. Now, as I look at the complaint that Judge Hatter examined, I see references to other, if you will, companies that do the same thing as Comcast does, you know, like the phone company and so on. But what I'm looking for were the references to the content providers that are comparable to your client. Where are the references that shows that your client was treated differently in connection with the negotiation of the contract than other people who are similarly content providers? I don't see that. Where is it? I think you find it in two places. First, Comcast is a company that's 55 years old and never has contracted with a 100 percent African-American-owned company. Even if you accept the two companies, Aspire and Revolt, the defendants point to, still only 0.01 percent of Comcast contracting is with African-American-owned companies. Okay, but I get that. I get that point. But you still, I think, need to show what other companies, what white-owned companies were treated differently by Comcast in this situation. Well, I think the statistics I just presented there in the complaint do that, but there's another way also. There are 500 channels that are covered by the other large cable companies, AT&T, Verizon, Vios, DirecTV, and Dish. Of those 500 channels, all of them are carried by Comcast, except for those owned by the plaintiffs. So all of the white-owned companies are carried by those companies, but not these that are owned by an African-American. But help me with this, though, Dean. AT&T and so on, those are people who are in a comparable situation as Comcast. They take the content produced by other people and they put it out there through various means. They're all multi-channel video programming distributors. Correct. So here you've got Comcast, and they negotiate for, I think, 10 years, if I understand correctly, with your client. They give a lot of excuses and so on, and except for the Bob Jones reference, which is not repeated in the SAC, the inference that you draw is that it's race-based. As you know, Judge Hatter knows a lot about civil rights. He didn't find a 1981 action here that said it wasn't plausible. I'm also struggling with it. The reference that you make there about all these other companies do certain things, how does that directly correspond to the requirement that it be plausible as to this company? In Arlington Heights v. Villageland Heights Metropolitan Development Corporation, the Supreme Court said you can infer intentional discrimination from patterns so stark as to leave no other explanation. The statistics I presented to you are such a pattern. Also, as the complaint points out, when there are other African-American-owned channels, the Black Family Channel, the Historically Black College Channel, Soul Train, again, Comcast refused to contract with them. The other way, Your Honor, you can look at that is in Desert Palace v. Costa. The Supreme Court said you can infer discrimination when the alternative explanations are refuted. Every alternative explanation that Comcast offered was refuted as refuting the complaint. They said you'd have to get support from field representatives. Here, the plaintiffs did. Then Comcast said we're not going to have any additional bandwidth. But then they took on 80 additional channels and two additional networks. They said we're only going to do sports and news, and then they took on entertainment. All of this, I think, under Desert Palace v. Costa allows you to infer that there's a plausible claim of race discrimination. Also, with regard to the Bob Johnson comment, it was in the first complaint. It was not in this. Trial counsel said in the district court it was inadvertently omitted. Let the complaint be amended and included. I think it's striking that the appellees here go on and on in their brief quoting the first complaint and then say we can't refer to something in the first complaint. I think they very much opened the door for this Court to consider what's in the first complaint by what they have in their brief. And to say, as was uttered here, we want no more Bob Johnsons is clearly about race because Bob Johnson was the most successful African-American. So I think when you put all of this together, it certainly shows a plausible claim for race discrimination, one to get past 12b-6. Let me ask you this, Mr. Chemerinsky, because I have not been through the entire record as yet. Judge Hatter said that in dismissing the First Amendment complaint, the Court clearly identified the problem. The benchmarks provided by plaintiffs allegedly representing demand by viewers for ESN channels were ambiguous and did not exclude the alternative explanation, the Comcast's refusal to contract with ESN was based on legitimate business reasons, and the Court went out of its way to suggest cures for the pleading deficiencies, but they weren't cured. What were the cures that the district court suggested here? It's not clear to me what would cure what the district court was saying, because in light of the statistics that I just said to Judge Smith, this seems clear in showing that it's a plausible claim of race discrimination. These channels have 80 million viewers. They've been Emmy nominated. They've won in terms of Emmys. I think, Judge Schroeder, if you go through literally every explanation that's offered by the defendants, they're refuted in the allegations in the complaint, which is all that's required under Desert Pallet for stochasticity. So from your perspective, basically it's kind of a smell test. Is that a good way to put it? I mean, put Bob Johnson aside for the moment. You look at the totality of what has been presented here, there doesn't seem to be a very good other way to explain it, and yet there's no express allegation that says we were treated this way, but this white-owned content producer was treated differently, and so on and so on. Is that correct? I think the complaint says exactly that. It says there are 500 channels, all of which are carried by every other cable company, except those that are owned by African-Americans. It's striking that since 55 years, Comcast is never contracted with 100% African-owned business. Hard to see a statistical pattern more stark than that. And all that's required at this stage is it to be plausible, not that it has to be proven. And you think that the statistical analysis is enough and a disparate impact to do that. Is that correct? I think that I'm not claiming that it's a disparate impact. I am claiming that you can infer intentional discrimination from the statistical pattern. That's what the complaint alleges, doesn't it? Yes, it does. And, in fact, I mean, if you want the specific allegations of the complaint, if you look at in terms of the statistical pattern that I mentioned, the other channels that are not carried, the Black Family Channel, Soul Train, that's paragraphs 89 to 101, except the record 109 to 112. It's throughout the complaint in terms of Comcast never having contracted with an African-American channel in 55 years, that only 0.01% of the business was African-Americans. And, again, at this stage, all it has to be is plausible. And once it's plausible to start with SPACA, you can only dismiss if they can show that this is just implausible. And that's not possible at this point in time. Do you want to save your five minutes, Dean? Yes, I will at this point. Thank you. All right. Good morning, and welcome, Mr. Strada. Welcome from D.C. We've been busy back there. Well, not me, personally. Thank you. Other people. Thank you, Your Honor, and may it please the Court. Judge Hatter gave the plaintiffs three opportunities to plead a Section 1981 claim that would stand scrutiny under Igbo and Twombly, and even gave them advice as to what to do. Well, would you tell me what he was talking about? Yes. How would this be clear? He was pointing out to the fact that each time the plaintiffs tried to say that others had been better treated than them and identified those networks as white-owned networks, they referred only to what the Court described as opaque benchmarks. What does that mean? Well, they said that they were highly attractive, or they themselves would have been highly attractive, because they had awards, as if shows with awards did not get canceled for lack of viewerships, that they had had an increase in percentage terms in the number of people that watched them. And Judge Hatter said, well, if you went from 1 to 10 viewers, that would be 900 percent, but that doesn't mean that anybody is interested in you. You're also not telling me anything about the other networks that you claim were hired in preference to you, how they're similarly situated to you. So there was nothing to compare all of these other networks. Was he saying that they had to show that this network would have as big an audience as the other networks? You know, I think what he was saying is give me something that makes this plausible. And in order for ñ but in order to understand why he thought that this was relevant, Your Honor, it's very important to understand that what he was getting from the get-go was conspiracy theories and contri-racial categories. Now, the dean would like very much to get away from that, and he claims that we are trying to talk about his first complaint as though we are trying to talk about the complaint that was left to the side. I'm still not understanding. What should the complaint have said that it didn't say? If you were pleading it, that they were unable or unwilling to plead. In the first case, the complaint should not have pleaded that we had engaged in a pattern of discrimination that involved our doing it with the government, the NAACP, the Urban League, Al Sharpton. That's a negative. But what should have been added to the complaint that would make it plausible when this is not plausible? Once you start with the proposition that we're doing it with the entirety of the world, that's in itself inherently impossible. I don't know what you could possibly say to make that plausible. If you start with the proposition that we're conspiring with the federal government to discriminate on the basis of race, then it seems to me, which is paragraph 59 of this complaint, then it seems to me almost inherently impossible to add anything that would render the core of the discrimination claim actually plausible. You're starting with a discrimination claim that starts with the proposition, as paragraph 59 of this complaint says, that the federal government works hand in glove with white media to perpetuate the exclusion of black enterprises from the carriage and cable companies. It goes on to say that we have entered into all of these efforts to bribe civil rights organizations, those who signed the MAU, and these are paragraphs 62, 64, and 65 of this complaint, not an earlier complaint, in which we have bribed these organizations to give us cover to license race discrimination. Now, if you start with a proposition that we have engaged in failure to carry as part of a deal with the federal government and the oldest civil rights organizations in the country, it seems to me inconceivable that you could come up with any allegation of fact that would make that plausible. That's outlandish. Well, let's assume that you identified the weakness in the complaint, and I think the various iterations of the different complaint to me isn't as important because I'm really focusing on the latest complaint and the one that's currently on appeal. So let's say that the statistical evidence or allegation mentioned by Dean Chemerinsky in and of itself wouldn't be sufficient to reach the inference that he would like us to reach. But in addition to the statistical evidence cited, there is a kind of a pattern of conduct alleged in the complaint. In this case, that amounts to a departure or variation from normal procedures, and also some rebuttal of the alternative plausible explanation that these are legitimate business reasons, and I'll give you some example and ask how you would respond to it. There are numerous allegations throughout the complaint that talk about the runaround that ES was asked to do, and some examples include executives telling ES to go get empirical data to kind of shore up their request, and they did it, but now it doesn't matter anymore, to go to the other divisions and build up support. Oh, but wait a minute, it's really corporate's decision, present empirical field evidence, but okay, now field evidence doesn't matter anymore. Oh, we don't have enough bandwidth, but in the same time period, all of these other, and the allegations are sufficient, very specific, that over 80 newer lesser-known white-owned networks have been added, despite Comcast's claim that they didn't have sufficient bandwidth. And so all of these allegations, I think in order to test plausibility, you have to kind of look at all of them and stack them up to say, okay, that coupled with the statistical evidence, does that suggest circumstantial evidence or allegations that would be sufficient to meet the plausibility test? We're talking about 12B6 stage at this point. Well, sure. So how would you respond to that? I'd like to say three things, Judge Nguyen. First, the allegations in the complaint are not the same thing as the advocacy of counsel. You're basically dealing with the things that are summarized, I think, at page six of the reply brief, and I think it is a very careful job of culling what is arguably factual in a very long pleading, and I think I will go back to the point that finding shreds that are arguably factual in a pleading that is brimming with a conspiracy theory cannot overturn the basic character that caused Judge Hatter, who, as the court pointed out, is not unfamiliar with true race discrimination, to say that this was implausible. But taking those as they are, I will start with my first example, this field example. That's paragraph 45 of the complaint. This is described in the briefing as a reversal of normal procedure. I ask you to go to paragraph 45 of the complaint, which is at ER 96, and read it, and compare it to how it is described in the briefing. Paragraph 45 of the complaint merely says that an executive, Jennifer Geiske, advised plaintiffs that getting field support would be helpful in helping her make a case to other senior executives. There is no allegation that this is a normal process. There is no allegation that this, if obtained, would get encouraged. There is no allegation that, in fact, field support of any particular description was obtained. It says field support of some undescribed nature was obtained. It is a vaguest allegation and is not an allegation, as is described in the briefing, that they obtained something that shows that Comcast departed from what they described in the briefing as normal procedure. To go back to the bandwidth, I refer you to what is cited in all of the briefing at the statement of the regulator of this industry, the Federal Communications Commission. It points out in Herring that it is an everyday occurrence in this industry that there are a lot of more people knocking at the door asking for carriage that can possibly be carried. That's true. That's true for everyone that wants to be carried, that they know that there's a limited bandwidth and that there has to be some selectivity. And the question is, what is the criterion that is being used for that selectivity? And if it's race, that's illegal. Isn't that correct? It is an editorial judgment, and I think race discrimination is illegal. We don't take issue with that. But let me point out to you the third point as to why this is implausible, and it's a central point that I think the dean very carefully elided in his presentation, this notion of the 100 percent African-American network. The complaint affirmatively alleges in multiple points that while the application was being considered, Comcast in fact gave carriage to African-American-owned networks. This is affirmatively pleaded, right? Where is that? This is the Aspire Network, the Revolt Network. This is at paragraphs 73 to 81. There is the Africa Channel, which I think is ER 92, which is paragraph 33. And so there is an affirmative allegation that African-American-owned channels were actually given carriage in the same period. It seems to me that that is important because it's one thing to infer from, as Dean Chemerinsky indicates, if you've got 500 channels African-American-owned, nobody gets covered, zero. Quite another when you have others that are affirmatively African-American-owned and they get coverage. Correct. And the complaint has conclusory allegations that these are fronts for white businesses, but there is no factual support. This is, again, part of what I started out. Well, but this is a pleading. At what point do we have to have evidence pled? Judge Roder, I've been practicing law long enough to remember the Conley days, too. But, in fact, Conley and Iqbal make very clear that if somebody is going to make a claim of that nature, it cannot simply be inconclusive and formulaic. And the factual recitation here is that these channels are African-American-owned and that Comcast has not demonstrated exactly how that is. I don't think that that is actually an affirmative allegation that they're not African-American-owned. Let me ask you this, Mr. Estrada. Let's change your role here. You're suddenly the attorney for the plaintiffs. And what would you need to say in your complaint to state a cause of action under 1981? I would have to come up with a showing that but for my race. Let me just ask you, you say but for. That, of course, goes to the issue of grass and the others. But looking at this statute, which has peculiar wording, we probably don't even have to get to those others. And that just says if you're treated differently than white people, you've got your causation there. At least that's the way I read it. So with that in mind, what would you have to say? You have to point out that, you know, there are people who are comparable to you who are similarly situated, that you are qualified, that you apply. Would you have to name them some examples? Sure. And just let me make clear, they tried to identify networks that were giving carriage. But, of course, we are in the business of carrying networks. Identifying networks that were giving carriage is the easiest thing in the world. But if that were entirely sufficient, the plausibility standard would be out the world because that doesn't show anything about how they're similarly situated. Now, the other aspect of this, which I think is really very important because it really goes to what is a legal requirement in this case, is this notion of the contrived racial category of 100 percent African American. This is a Reconstruction era statute. Way back when, when the issue came up in 1987, the Shirey Tefilah case, the Supreme Court held that even people of the Jewish faith could sue under the statute on the theory that the Reconstruction Congress would not have considered them white. But, you know, in those dark days, in the 19th century, people who had very little African American blood were considered African American. So the notion that you're going to have a special category of 100 percent African American and only that is the protected class in this statute is sort of backwards. So from your perspective, the fact that they say the category is 100 percent African American owned makes it different than, say, 75 percent African American owned. I'm saying it is legally non-cognizable as a category because the issue is whether we discriminate on the basis of race. And if the pleading affirmatively alleges that we carried African American networks, they are pleading themselves out of court and they cannot save that pleading by alleging that those networks were not 100 percent African American even if one was. If the pleading alleges that Comcast carried other African American owned stations that maybe weren't 100 percent owned but were African American, say, majority owned, that that's enough to knock them out of court under 1981. Is that your position? Which it lessens the influence of discrimination, particularly when you take it into account with the other aspects of the outlandishness that I started with. Make it implausible? It is entirely implausible. Of course, if you start with the allegations that I started out in paragraph 49, that we're doing this with the federal government. You know, this is not Star Vs. Baca. I mean, you know, the notion that we are in league to discriminate against a special category of African Americans and that we're doing it with the federal government, the NLCP, the NAACP, the Urban League, All Sharpton, DD Coms and Magic Johnson is not merely implausible, it's outlandish. One final point, if I could just make it. Can I ask you a question with Judge Smith's indulgence? I just want to make sure that I understand your answer as to how the 100 percent African American owned allegations sort of defeat the plausibility. And specifically, for example, with regard to paragraph seven of the complaint, it says Comcast has continued to offer bandwidth and network carriage to newer, lesser known, white owned television networks, while at the same time, essentially, taking advantage of the fact that they are African American. And telling ES that it didn't have any bandwidth or carriage availability. Years long refusal to allow subscribers access to 100 percent African American owned media company is illustrative of racial animus. So as I understand your argument, you're saying that by alleging, on the one hand, carrying white owned networks, but on the other hand, refusing to carry 100 percent African American owned networks. That's not enough to meet the plausibility standard, because it doesn't include some allegation that there could be, for example, majority African American owned media companies who were offered carriage contracts? No, I'm saying something slightly different, Your Honor. I am saying that there are separate allegations of the complaint that affirmatively plead that during the same period we gave carriage to African American networks. That's point one. Point two, that saying that we gave carriage to white networks is nothing more than a formulaic recitation of the offense, because of course we're in the carriage business. It would be very hard to not say that we give carriage to the majority race in the country. I mean, we gave carriage, I mean, if we give carriage to anybody, that's likely to be the case. And so that doesn't actually add anything to the case. But finally, the point that I'm really making is that if the case is otherwise implausible, as it is by allegations that we are in this with the federal government and civil rights organizations, and as it is by pleading that we have hired African American networks, it doesn't get saved by inventing a novel racial category that is not merely African American discrimination. There is one real point that I think is important to note, which is this notion of our major competitors, which is, again, something that is different in the briefing from the pleadings. The latest complaint is able to allege that they are carried by Verizon, AT&T, and DirecTV, only by dint of the fact that they sued AT&T and DirecTV. But it was product of settlement. Correct. And in describing the collectibles as all of our major competitors, that is, again, a, let us say, an exaggeration in the briefing, because, of course, if you look at the situation when they first sued us, the only major competitor of ours that actually carried them was Verizon, which was an outlier, which is why they had to sue Time Warner, AT&T, DirecTV. And the fact that there was a campaign of litigation necessary to sort of bring this highly valued product to the attention of all of these companies that were not interested in carrying them, again, also lessens the influence of discrimination and gives, you know, the lie to the notion that this is attractive to large MVPD companies. And it is quite contrary to the representation that is made in the briefing of what's in the complaint. Let me ask you one more thing, or you're out of time, but it's, this statute was drafted after the Civil War, part of the Civil Rights Act in 1866. But we're trying to apply it now. The Civil Rights Act have traditionally been, we've been told to construe them liberally because they have an important purpose in mind. And yet we now are in the era of Iqbal and Twombly. How do we mesh those two concepts? How do we deal with the concept of construing a pleading liberally, which would suggest you really cut a bend over backwards to let them at least get to discovery, versus the very real barrier of Iqbal and Twombly? Well, Iqbal itself was a discrimination case, right? And Iqbal was, could not have been more clear that Iqbal was an interpretation of Rule 8. And when an attempt was made in Iqbal itself to say, you should limit this to antitrust cases or complex cases, the court was quite definitive, saying, no, we're interpreting Rule 8. This applies to all cases. It seems to me that the fair answer to that judgment is to say that, you know, the justice system is best served to, in making people with possible cases get in court. And use, you know, the resources of the court. And allowing experienced judges like Judge Hatter to weed out those that are truly implausible and give his attention to those that actually can clear the bar so that those who have an actual grievance can get justice. Okay, thank you. Dean Chemerinsky, I bet you have some comments. Am I right? Can I ask you this, Dean? I agree with Judge Smith's point that, you know, you're alleging a race discrimination case. And so, of course, the most powerful allegations would be these people were similarly situated to me in all respects, except with regard to race. They got it, I didn't. And as I read the complaint, you don't have anything that clean cut. But what you do have is little bits and pieces. You've got, well, they're giving me the runaround. Well, the statistical evidence suggests that they haven't in the past worked or contracted with 100% African-American-owned companies. And so in the task of putting together those little bits and inferences to see whether you've alleged a plausible case, I think counsel for Comcast did a nice job pointing out some of these more outlandish allegations. And it's arguable that perhaps some of the allegations oversold your case. Do we weigh that in testing the plausibility of the complaint overall? First, Your Honor, the complaint does do exactly what you said and what Judge Smith was asking for and what Mr. Estrada said was needed. I direct you to paragraph 51 of the complaint, at excerpt record 97. It says in the second line, but Comcast has added other non-news, non-sports channels during the relevant period, and Comcast did so while simultaneously refusing to contract, not only with either entertainment studios, but also with historically black colleges and universities. Comcast has added other channels since 2010, none of which are African-owned, that are unrelated to sports and news. These include Baby First America's, Fit TV, Outdoor Channel, and many others, all white-owned networks. It's exactly the comparison that's required. Nothing more than that should be needed in a complaint. To go to your direct question, when you look at the evidence that is presented here, together it shows a plausible claim of discrimination. Take the statistical pattern. In 55 years, Comcast has never contracted with a 100% black-owned station. Mr. Estrada says, but that's a false category because they're contracting with 75% or 50% black-owned stations. That's Mr. Estrada's assertion. That's not before the court as you evaluate the motion dismissed. He says also is, well, the reason all of these other cable companies carry these channels, but Comcast doesn't, is because there were lawsuits. Again, that's not in this complaint. In fact, there was an industry-wide pattern of discrimination found by the Federal Communication Commission. The fact that it took lawsuits to deal with it doesn't mean that there's less discrimination. In Desert Palace v. Costa, the Supreme Court explicitly said if all of the nondiscriminatory rationales are refuted, you can infer race discrimination. As you were pointing out in your questions to Mr. Estrada, the complaint very carefully goes through each of the other alternative explanations, meaning field representatives, competitors, bandwidth, sports and news. All of these instances, none of these are accurate. But with respect, I'm still struggling with the fact that we don't have the normal but-for versus one-of-a-number causation issues. This is a statute that talks about treatment that's different for white people and others. Given that fact, where does the plaintiff come up with the idea that if you are 100% African-American-owned, that that's different? That's different than, say, 75% African-American-owned. But there's nothing in this record to indicate that Comcast was contracting with 75%-owned African-American companies. We can certainly have a dispute over whether Aspire and Revolt are 2% or 75% African-American, but that is a factual dispute. That has to be resolved at summary judgment or trial, not based on Mr. Estrada's assertions to you this morning. But why does the complaint repeatedly say that Comcast refuses to work with 100%-owned African-American companies? Is there, like, an inference that we can draw there? Why not just say Comcast doesn't deal with African-American-owned companies, period? That's certainly true, but in this instance it is 100% African-American-owned company, and Comcast refused to deal with it. We then could get to the question of who does Comcast deal with and what percentage African-American-owned are they, and we could, through discovery, gain that information. But we're not required in a complaint in order to withstand a motion to dismiss to have that kind of factual information, not even under if, ball, and twombly. Even under if, ball, and twombly. That's right, Your Honor. Even under if, ball, and twombly, we're not required to prove the case at the complaint stage. All that's required is allegations, and there is so much here, a statistical pattern so starkly in the explanation, refuting all of the other alternative explanations and the other facts here, including that white-owned channels were accepted, but black-owned channels were rejected. And you don't have to refute what you think may be a defense that is asserted? Not in the complaint, Your Honor. Well, not in the complaint. Not even under if, ball, and twombly.
judges: Schroeder, M. Smith, Nguyen